WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY

BY:    MAXINE S. MAK (031158)
       CHARLES E. TRULLINGER (018936)
       Deputy County Attorneys
       makm@mcao.maricopa.gov
       trullinc@mcao.maricopa.gov

CIVIL SERVICES DIVISION
Security Center Building
222 North Central Avenue, Suite 1100
Phoenix, Arizona 85004
Telephone (602) 506-8541
Facsimile (602) 506-8567
ca-civilmailbox@mcao.maricopa.gov
MCAO Firm No. 00032000

Attorneys for Defendants Penzone & Vail

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| Anthony Jerome Wright, | NO. CV17-04161-PHX-SMB (DMF) |
|---|---|
| Plaintiff, | **DEFENDANTS PENZONE AND VAIL'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| Paul Penzone, et al., | |
| Defendants. | |

        Defendants Maricopa County Sheriff Paul Penzone ("Penzone") and Captain Scott Vail ("Vail") submit this Separate Statement of Facts in support of their motion for summary judgment.

1.      Anthony Wright ("Wright") is a pretrial detainee in custody of the Maricopa County Sheriff's Office ("MCSO"). [Doc. 1 at 4, Declaration of Cody Baker ("Baker Decl.") (Ex. 1), at ¶ 3.]

2.      Wright was classified as maximum security because of his pending charges, $2,000,000 bond, four or more felony arrests, and prior arrests. [Declaration of Leonel Chacon ("Chacon Decl.") (Ex. 2), ¶ 15.]

3.      Wright was housed in general population. [Chacon Decl., ¶ 15.]

4.      After he was booked, Wright was charged with three counts of first degree murder, one of the victims was a law enforcement officer. [Chacon Decl., ¶ 16.]

5.      Due to the new charges, Wright was reassigned from general population to Closed Custody. [Chacon Decl., ¶ 16.]

6.      In Closed Custody, Wright was housed alone in a cell connected to an individual day room. [Declaration of Lieutenant Brett Marty ("Marty Decl.") (Ex. 3), Attach. 2.]

7.      Wright's dayroom consisted of a desk, stool and telephone. [Deposition of Anthony Wright dated January 16, 2019 ("Wright Dep.") (Ex. 4), at 10:14-18; Marty Decl., Attach. 2.]

8.      Wright was allowed into his dayroom for an hour each day. [Wright Dep., 10:23-25; 11:1-2.]

9.      Inmates housed in Closed Custody are restrained and escorted by more than one officer when out of their cell. [Marty Decl., ¶ 11.]

10.      In Closed Custody, Wright can make phone calls, have visitors, send and receive letters, receive religious guidance, access legal services, access the library, order items from the jail canteen and go to recreation for an hour. [Wright Dep., 15:4-25, 16:1, 5-8; Chacon Decl., ¶ 12; Marty Decl. ¶ 12.]

11.      Wright was able to share canteen items with other inmates in his housing unit. [Wright Dep., 62:7-9]

12.     Wright went to recreation daily and exercised daily. [Wright Dep., 15:4-23.]

13.     Due to staffing limitations, MCSO is unable to offer inmates more than an hour of recreation per day. [Marty Decl., ¶ 8.]

14.     The times for recreation vary by day. [Wright Dep., 15:4-23.]

15.     The recreation areas Wright used varied in size. They have concrete floors and concrete block walls, the top of which is covered by a metal grate and a white screen which allows fresh air and some light in. [Wright Dep. 14:12-20; Marty Decl., ¶¶ 4-7; *Id.*, at Attach. 1.]

16.     The Fourth Avenue Jail has four floors, takes up one city block in downtown Phoenix and does not have large open areas for inmates to recreate or congregate. [Marty Decl., ¶ 9.]

17.     Inmates housed in Closed Custody or special housing are interviewed by Classification Specialist every 30 days unless they are unavailable. Closed Custody or special housing assignments are reviewed by the Special Management Review Committee (SMRC) every thirty days to determine whether they are appropriate based on factors such as the length of time the housing assignment has been in place, the inmate's current and past institutional behavior, the inmate's initial classification, and the inmate's mental health.  [Chacon Decl., ¶¶ 13-14.]

18.     On September 11, 2012, Wright was reassigned from CCI to CCII by the SMRC. [Chacon Decl., ¶ 25.]

19.     From October 2012 to May 2013 Mr. Wright requested to be transitioned from CCII to CCIII. The SMRC reviewed the requests and determined that his housing assignment was appropriate. [Chacon Decl., ¶ 26.]

20.     Wright did not request a change in his housing in June 2013. The SMRC reviewed Mr. Wright's housing assignment and determined it was appropriate. [Chacon Decl., ¶ 27.]

21.   From July 2013 to October 2013, Wright requested to be transitioned from CCII to CCIII. The SMRC reviewed the requests and determined that his housing assignment was appropriate. [Chacon Decl., ¶ 28.]

22.   Wright did not request a change in his housing in November 2013. The SMRC reviewed Mr. Wright's housing assignment and determined it was appropriate. [Chacon Decl., ¶ 29.]

23.   From December 2013 to April 2014, Wright requested to be transitioned from CCII to CCIII. The SMRC reviewed the requests and determined that his housing assignment was appropriate. [Chacon Decl., ¶ 30.]

24.   In May 2014, Wright received disciplinary sanctions making him ineligible for a housing change. [Chacon Decl., ¶ 31.]

25.   From June 2014 to June 2015, Wright requested to be transitioned from CCII to CCIII. The SMRC reviewed Wright's requests and determined that his housing assignment was appropriate. [Chacon Decl., ¶ 32.]

26.   In July 2015, Wright received disciplinary sanctions and was ineligible for a housing change. [Chacon Decl., ¶ 33.]

27.   From August 2015 to March 2016, Wright requested to be transitioned from CCII to CCIII. The SMRC reviewed the requests and determined that his housing assignment was appropriate. [Chacon Decl., ¶ 34.]

28.   In April 2016, Wright received disciplinary sanctions and was ineligible for a housing change. [Chacon Decl., ¶ 35.]

29.   In May and June of 2016, Wright requested to be transitioned from CCII to CCIII. The SMRC reviewed Wright's requests and determined that his housing assignment was appropriate. [Chacon Decl., ¶ 36.]

30.   Wright did not request to transition in July or August 2016. [Chacon Decl., ¶ 37.]

31.   In September 2016, Wright requested to be transitioned from CCII to Closed Custody III (CCIII). On September 13, 2016, the SMRC reviewed Wright's

4

request and rehoused him from CCII to CCIII. On September 14, 2016, Wright refused to be rehoused. [Chacon Decl., ¶ 38.]

32.    In October 2016, Wright requested to be transitioned from CCII to CCIII. On October 11, 2016, the SMRC reviewed Wright's request and rehoused him from CCII to CCIII. On October 12, 2016, Wright refused to be rehoused. [Chacon Decl., ¶ 39.]

33.    From November 2016 to September 2017, Wright reported that he was ok and did not request any change in housing. [Chacon Decl., ¶ 40.]

34.    Wright was not interviewed in October 2017 because he was out to court. The SMRC reviewed Wright's housing assignment and determined it was appropriate. [Chacon Decl., ¶ 41.]

35.    In November 2017, Wright reported that he was ok and did not request a change in housing. The SMRC reviewed Wright's housing assignment and determined it was appropriate. [Chacon Decl., ¶ 42.]

36.    Wright was not interviewed in December 2017 because he was at a medical appointment. The SMRC reviewed Wright's housing assignment and determined it was appropriate. [Chacon Decl., ¶ 43.]

37.    From January 2018 to April 2018, Wright reported that he was ok and did not request a change in housing. The SMRC reviewed Wright's housing assignment and determined it was appropriate. [Chacon Decl., ¶ 44.]

38.    In May 2018, Wright wanted to know if he transitioned from CCII to CCIII, if he would be eligible to move to a four-hour out housing unit. The SMRC reviewed Wright's housing assignment and determined it was appropriate. [Chacon Decl., ¶ 45.]

39.    From June 2018 to September 2018, Wright reported that he was ok and did not request a change in housing. The SMRC reviewed Wright's housing assignment and determined it was appropriate. [Chacon Decl., ¶ 46.]

40.    In CCIII, inmates are housed in single occupancy cells and the dayroom is split between the upper tier and lower tier. Inmates in CCIII are allowed out one at a

time, or in groups of three for three hours at a time in the split dayroom. [Marty Decl., ¶ 13.]

41.     Wright did not want to transition to CCIII because he felt that his dayroom time was unpredictable, it was noisy, inmates were allowed into the dayroom in the early morning hours, and he had a co-defendant that was testifying against him who was housed there and he did not want trouble. [Wright Dep., 39:25, 40, 41:1-24.]

42.     On April 23, 2015, Wright's vision was 20/20. [Correctional Health Services Records ("CHS Records") (Ex. 5) at 8-9.]

43.     When he saw a provider on June 2, 2015, he reported an incident in December 2014, where his eye became red, painful and with facial droop. He reported decreased vision with white circles and black dots in his left eye. [CHS Records at 4-5.]

44.     Wright was seen by an ophthalmologist on August 7, 2015, for complaints of blurry vision and floaters in his left eye. He was diagnosed with posterior vitreous detachments requiring glasses to remedy the decreased vision in his left eye. [CHS Records at 2, 3.]

45.     Wright has reported periods of good sleep and periods of poor sleep. [CHS Records at 11, 13, 15, 17, 19, 24, 31, 33, 36, 38, 41, 43, 45, 47, 49, 51, 53, 55, 58, 61, 64, 67, 70, 73, 76, 78.]

46.     MCSO provides a multi-level process for the redress of inmate grievances regarding jail conditions. [Declaration of Sgt. Monica Bretado, ("Bretado Decl.") (Ex. 6.), ¶ 3; Bretado Decl., Attach. 1.]

47.     The process is established by the MCSO Policy DJ-3, Inmate Grievance Procedure, and is also detailed for inmates in Section 13 of the Rules and Regulations for Inmates.[1] [Bretado Decl., ¶¶ 4-5.]

48.     An inmate with a complaint must submit the Inmate Grievance Form to an officer within 48 hours of the disputed issue in an attempt to resolve the issue. [Bretado

---

[1] Although DJ-3 has been revised four times since 2010, the grievance process has remained substantially similar, sections providing evidentiary support for the steps in the process for each iteration of DJ-3 are identified.

Decl., Attach. 1 at 2 (Section (2)); Attach. 1 at 12 (Section (2)(B)); Attach. 1 at 24 (Section (2)(A)); Attach. 1 at 35 (Section (2)(A).]

49.     Officers and/or supervisors will try to resolve the issue, and if they cannot, the grievance is forwarded to the Shift Commander for resolution. [Bretado Decl., Attach. 1 at 2 (Sections (2)(A) and (B)); Attach. 1 at 13 (Sections (5)(A)(2) and (5)(B)(3)); Attach. 1 at 24-25 (Sections (4)(A)(2) and (4)(B)(1)); Attach. 1 at 36 (Sections (4)(A)(5) and (4)(B)(1)).]

50.     If the grievance is not resolved, the grievance is forwarded to the Bureau Hearing Unit (BHU) as a formal grievance. [Bretado Decl., Attach. 1 at 3 (Section (2)((B)(2)); Attach. 1 at 14 (Section (5)(C)(2)(b)); Attach. 1 at 26 (Section (B)(2)); Attach. 1 at 37 (Section (4)(B)(2)).]

51.     A BHU sergeant must meet with the inmate to try to resolve the grievance. If the inmate is dissatisfied with the BHU sergeant's response, they may appeal to the jail commander by filing an Inmate Institutional Grievance Appeal Form within 24 hours of receiving the BHU sergeant's response. [Bretado Decl., Attach. 1 at 3 (Sections (2)(B) and (2)(B)(3)); Attach. 1 at 14 (Section (5)(D)); Attach. 1 at 26 (Sections (4)(C) and (4)(C)(3)); Attach. 1 at 38 (Sections (4)(D) and (4)(D)(3)).]

52.     The jail commander must take action on the Inmate Institutional Grievance Appeal and provide the inmate with a written response to the appeal within seven days. [Bretado Decl., Attach. 1 at 4 (Section (4)(A)(1)); Attach. 1 at 16 (Section (7)(A)(1)); Attach. 1 at 27 (Section (6)(A)(1)); Attach. 1 at 39 (Section (6)(A)(1)).]

53.     If the inmate is dissatisfied with the jail commander's response to their Inmate Institutional Grievance Appeal, they must file an External Grievance Appeal within 24 hours of receiving the jail commander's response. [Bretado Decl., Attach. 1 at 5 (Section (4)(A)(1)(b)); Attach. 1 at 16 (Section (7)(A)(1)); Attach. 1 at 27 (Section (6)(A)(1)(b)); Attach. 1 at 39 (Section (6)(A)(1)(b)).]

54.     The External Grievance Appeal must be forwarded to the BHU commander who shall review the appeal and determine whether the issue being appealed is valid. If

the appeal is determined to be frivolous, repetitive, or relates to a non-grievable issue, it shall be noted as such and forwarded to the appropriate bureau chief with the recommendation that the grievance process end. The bureau chief shall review the appeal, and make a finding as to whether the appeal shall proceed, or whether the grievance process should end and the appeal be returned to the inmate. [Bretado Decl., Attach. 1 at 5 (Section (B)(1)); Attach. 1 at 17 (Section (7)(B)); Attach. 1 at 28 (Section (6)(B)(1)); Attach. 1 at 40 (Section (6)(B)(1)).]

55.     If the grievance is determined to be valid, the External Grievance Appeal shall be forwarded to the External Referee, who must provide a written response to the appeal. The grievance process is exhausted once the inmate receives a written response from the external referee. [Bretado Decl., Attach. 1 at 5-6 (Sections (6)(B)(1)(a) and (6)(B)(5)); Attach. 1 at 17 (Sections (7)(B)(ii) and (7)(B)(4)); Attach. 1 at 29 (Section (6)(B)(4)); Attach. 1 at 40 (Section (6)(B)(1)(b)(4)).]

56.     Wright understands the grievance process and how it works. [Wright Dep., 30:13-25, 31, 32:1-15.]

57.     Wright exhausted 28 grievances before filing this lawsuit. [Wright Dep., Bretado Decl., ¶ 10.]

58.     Wright exhausted administrative remedies as to his housing assignment on June 1, 2015. [Bretado Decl., ¶ 14.]

59.     Wright did not file any grievances about the lighting in his cell, lack of outdoor recreation, lack of fresh air or sunlight in the recreation areas, lack of exposure to sunlight in general, or being denied Vitamin D. [Bretado Decl., ¶¶ 11-13.]

60.     As Jail Commander, Vail responded to nine of Wright's grievances. [Declaration of Captain Scott Vail ("Vail Decl.") (Ex. 7), ¶ 5.]

61.     None of the nine grievances that Vail responded to referred Wright's alleged deteriorating mental state, the lighting in his cell, or the lack of exposure to sunlight. [Vail Decl., ¶¶ 6-7, 9.]

62.     None of the grievances that Vail responded to requested that Wright be moved out of Closed Custody. [Vail Decl., ¶ 7.]

63.     Mr. Wright has never spoken to Vail about his grievances. [Wright Dep. 28:4-8.]

64.     Disciplinary sanctions have been imposed on Wright for violation of jail rules on six occasions. The disciplinary sanctions were imposed for disobeying orders, lying to staff, failing to comply with security protocol, and manufacture/possession of suspected narcotics/promotion of prison contraband. [Baker Decl., at Attach. 1.]

65.     Wright's cell is equipped with two 25-watt lights which are on during the day and turned off at night. [Vail Decl., ¶ 10; Declaration of Facilities Maintenance Officer Joseph Peterson ("Peterson Decl.") (Ex. 8), ¶ 5.]

66.     When the daytime lights are off, the nightlight is turned on so that officers can see inmates when they conduct nighttime security checks without the use of flashlights. [Vail Decl., ¶ 11; Peterson Decl., ¶ 5.]

67.     Flashlights are not utilized during nighttime security checks because to see into Wright's cell, officers must shine the flashlight through two panes of glass, which creates a glare which that it difficult for officers to see into the cell. [Vail Decl., ¶ 11.]

68.     Turning the lights off at night and entering the dayroom in the dark to shine a flashlight through the window into the cell is not a suitable option because inmates can manipulate the lock in the cell door so that it appears locked but is not, creating a security risk when officers open the door and step into a dark dayroom to conduct a security check. [Vail Decl., ¶ 12.]

69.     Vail was not involved in the classification process, did not make any of Wright's housing assignments and did not direct that Wright be housed in Closed Custody. [Vail Decl., ¶ 13.]

70.     Vail does not make classification policy and does not have the authority to override policy directives regarding the classification of inmates. [Vail Decl., ¶ 14.]

71.   Vail does not have the authority to override directives regarding the housing of inmates in Closed Custody. [Vail Decl., ¶ 15.]


**RESPECTFULLY SUBMITTED** this 27th day of August, 2019.

WILLIAM G. MONTGOMERY
MARICOPA COUNTY ATTORNEY

By /s/Maxine S. Mak_____
    MAXINE S. MAK
    CHARLES E. TRULLINGER
    Deputy County Attorneys
    *Attorneys for Defendants Penzone & Vail*

1

## CERTIFICATE OF SERVICE

2

3

I hereby certify that on August 27, 2019 I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

4

5

Honorable Susan M. Brnovich
United States District Court

6

Sandra Day O'Connor U.S. Courthouse, Ste. 526
401 W. Washington St., SPC 19

7

Phoenix, AZ 85003-2151

8

9

Honorable Deborah M. Fine
Magistrate Judge

10

United States District Court
Sandra Day O'Connor U.S. Courthouse, Ste. 321

11

401 W. Washington St., SPC 15
Phoenix, AZ 85003-2120

12

13

Sarah L. Barnes, Esq.

14

Broening, Oberg, Woods & Wilson, P.C.
2800 N. Central Ave., Ste. 1600

15

Phoenix, AZ 85004

16

*Attorney for Defendant Dr. Alvarez*

17

and copy mailed to:

18

19

Anthony J. Wright, #P715875
3250 W. Lower Buckeye Rd.

20

Phoenix, AZ 85009
*Plaintiff Pro Se*

21

22

/s/ V. Sisneros

23

S:\CIVIL\CIV\Matters\CJ\2018\Wright v. Penzone CJ18-0096\Pleadings\MSJ SSF.docx

24

25

26

27

28